**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**NEWARK DIVISION**

| | | |
|---|---|---|
| SIA MOODY and IVAN BEY, Individually, and on Behalf of All Others Similarly Situated, | ) | |
| Plaintiffs, | ) | Case No. 25-17227 |
| v. | ) | **JURY TRIAL DEMANDED** |
| CONDUENT BUSINESS SERVICES, LLC | ) | |
| Defendant. | ) | |

**CLASS ACTION COMPLAINT**

Plaintiffs Sia Moody and Ivan Bey ("Plaintiffs"), through their undersigned counsel, bring this action against Conduent Business Services, LLC ("Conduent" or "Defendant") pursuant to the investigation of their attorneys, personal knowledge as to themselves and their own acts and otherwise upon information and belief, and allege as follows:

**INTRODUCTION**

1. Conduent is a third-party vendor for various health care insurers including Blue Cross Blue Shield of Illinois.

2. On or about October 24, 2025, Conduent announced that it had experienced a hack and exfiltration of customer data between approximately October 21, 2024 and January 13, 2025 (the "Data Breach").[1]

3. While Conduent has not publicly reported what sensitive personal information ("SPI") was included, notices sent to Plaintiffs include, names, Social Security numbers, address,

---

[1] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/389e9d0d-8e23-497d-aaab-1c4c8a80707f.html, last accessed November 3, 2025.

date of birth, treatment and diagnosis information, treatment cost information, treatment date information, "other medical information," health insurance number, and provider information.

4. Plaintiffs and Class members now face a present and imminent lifetime risk of identity theft, which is heightened here by the loss of Social Security numbers.

5. The information stolen in cyber-attacks allows the modern thief to assume victims' identities when carrying out criminal acts such as:

- Filing fraudulent tax returns;
- Using the victim's credit history;
- Making financial transactions on behalf of victims, including opening credit accounts in victims' names;
- Impersonating victims via mail and/or email;
- Impersonating victims in cyber forums and social networks;
- Stealing benefits that belong to victims; and
- Committing illegal acts which, in turn, incriminate victims.

6. Plaintiffs' and Class members' SPI was compromised due to Defendant's negligent and/or careless acts and omissions and the failure to protect the SPI of Plaintiffs and Class members.

7. As of this writing, there exist many class members who have no idea their SPI has been compromised, and that they are at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

8. Plaintiffs bring this action on behalf of all persons whose SPI was compromised as a result of Defendant's failure to: (i) adequately protect Plaintiffs' and Class Members' SPI, (ii) adequately warn Plaintiffs and Class Members of its inadequate information security practices, and (iii) effectively monitor its platforms for security vulnerabilities and incidents (the "Class"). Defendant's conduct amounts to negligence and breach of contract.

9. Plaintiffs and similarly situated individuals have suffered injury as a result of

Defendant's conduct. These injuries include: (i) lost or diminished inherent value of SPI; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their SPI; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iv) deprivation of rights they possess under common law and state statutes; and (v) the continued and certainly an increased risk to their SPI, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the SPI.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

11. This Court has personal jurisdiction over Defendant because Defendant's principal places of business are located within this District.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in, were directed to, and/or emanated from this District. Defendant resides within this judicial district and a substantial part of the events giving rise to the claims alleged herein occurred within this judicial district.

## PARTIES

13. Plaintiffs Sia Moody and Ivan Bey are natural people and a married couple residing in the DuPage County, Illinois. Plaintiffs were informed separately via letters dated October 24, 2025 that they had been victims of the Data Breach.

14. Defendant Conduent Business Services, LLC is a Delaware limited liability company with its principal place of business in Florham Park, New Jersey.

## FACTUAL ALLEGATIONS

15. Conduent Business Services is a third-party vendor for, among other healthcare organizations, Blue Cross Blue Shield of Illinois.

16. In the ordinary course of doing business with third parties such as Blue Cross Blue Shield of Illinois, Class Members indirectly provide Defendant with their customers' SPI, such as:

a. Contact and account information, such as name, address, telephone number, email address, date of birth, and household members;

b. Authentication and security information such as government identification, Social Security number, security codes, and signature; and

c. Health information; including health insurance information; patient histories, and information involving visits to other health professionals; and

d. Financial account information, such as bank account and credit card numbers.

17. On or about October 24, 2025, Defendant issued letters to affected patients and similarly situated individuals stated that "On January 13, 2025, we discovered that we were the victim of a cyber incident that impacted a limited portion of our network. We immediately secured our networks and initiated an investigation with the assistance of third-party forensic experts. Our investigation determined that an unauthorized third party had access to our environment from October 21, 2024, to January 13, 2025, and obtained some files."[2]

18. While Defendant states that it became aware of the Data Breach on January 13, 2025, it took approximately nine months for it to begin to notify customers of the breach.

---

[2] *Id.*

19. As a result, Plaintiffs' and class members' SPI was in the hands of hackers for more than three quarters of a year before it began notifying them of the Data Breach.

20. While it has sent letters to relevant state attorneys general and to Class Members, it has not made any public statements, nor has it acknowledged on its website that the Data Breach occurred.

21. As of this writing, Defendant has offered no detailed information on the steps they has taken or specific efforts made to reasonably ensure that such a breach cannot or will not occur again beyond that "[w]e safely restored our systems and operations and notified law enforcement."[3]

22. Further, Defendant has not released any information on its website or issued any press releases acknowledging the Data Breach at all, preferring instead to simply send letters to the last-known addresses of those affected.

23. This response is entirely inadequate to Plaintiffs and class members who now potentially face several years of heightened risk from the theft of their SPI and who may have already incurred substantial out-of-pocket costs in responding to the Data Breach. Further, some unknown number of Class Members are and will continue to be unaware of the Data Breach.

24. Defendant had obligations created by contract, industry standards, common law, state statute, and representations made to Plaintiffs and Class members, to keep their SPI confidential and to protect it from unauthorized access and disclosure.

25. Plaintiffs and Class members provided their SPI to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep

---

[3] *Id.*

such information confidential and secure from unauthorized access.

26. Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches in the industry preceding the date of the breach as well as their own position as self-proclaimed experts in the cybersecurity space.

27. Conduent advertises itself as "One partner for a range of needs," and states prominently on its website that "Every day, we help industry-leading health plans reduce costs, enhance security and create better outcomes for their members, employees and communities – serving as a trusted advisor across your entire healthcare value chain."[4]

28. Indeed, data breaches, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known and completely foreseeable to the public and to anyone in Defendant's industry, including Defendant.

29. According to the Federal Trade Commission ("FTC"), identity theft wreaks havoc on consumers' finances, credit history, and reputation and can take time, money, and patience to resolve.[5] Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank and finance fraud.[6]

---

[4] https://www.conduent.com/healthcare-business-solutions/health-plan-administration/, last accessed November 3, 2025

[5] *See Taking Charge, What to Do If Your Identity is Stolen*, FTC, 3 (Apr. 2013), https://dss.mo.gov/cd/older-youth-program/files/taking-charge-what-to-do-if-identity-is-stolen.pdf, last accessed November 4, 2025.

[6] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 CFR § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id*.

30. The SPI of Plaintiffs and members of the Classes was taken by hackers to engage in identity theft or and or to sell it to other criminals who will purchase the SPI for that purpose. The fraudulent activity resulting from the Data Breach may not come to light for years.

31. Defendant knew, or reasonably should have known, of the importance of safeguarding the SPI of Plaintiffs and members of the Class, including Social Security numbers, dates of birth, and other sensitive information, as well as of the foreseeable consequences that would occur if Defendant's data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiffs and members of the Class a result of a breach.

32. Plaintiffs and members of the Class now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their SPI.

33. The injuries to Plaintiffs and members of the Class were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the SPI of Plaintiffs and members of the Class.

34. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

35. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their networks' vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone

is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

36. The FTC further recommends that companies not maintain SPI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

37. The FTC has brought enforcement actions against businesses for failing to protect consumer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

38. Defendant failed to properly implement basic data security practices, and their failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer SPI constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

39. A number of industry and national best practices have been published and should have been used as a go-to resource and authoritative guide when developing Defendant's cybersecurity practices.

40. Best cybersecurity practices include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

41. Upon information and belief, Defendant failed to meet the minimum standards of the following cybersecurity frameworks: the NIST Cybersecurity Framework Version 1.1

(including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established standards in reasonable cybersecurity readiness.

42. These foregoing frameworks are existing and applicable industry standards in Defendant's industry, and Defendant failed to comply with these accepted standards, thereby opening the door to the cyber-attack and causing the Data Breach.

43. Businesses that store personal information are likely to be targeted by cyber criminals. Credit card and financial account numbers are tempting targets for hackers. However, information such as dates of birth and Social Security numbers are even more attractive to hackers; they are not easily destroyed and can be easily used to perpetrate identity theft and other types of fraud.

44. The SPI of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[7]

45. Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration ("SSA") stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that

[7] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs, last accessed November 4, 2025.

> someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[8]

46. What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

47. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[9]

48. Furthermore, as the SSA warns:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[10]

---

[8] SSA, *Identity Theft and Your Social Security Number*, SSA Publication No. 05-10064 (Jun. 2018), https://www.ssa.gov/pubs/EN-05-10064.pdf, last accessed November 4, 2025.

[9] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft, last accessed November 4, 2025.

[10] SSA, *Identity Theft and Your Social Security Number*, SSA Publication No. 05-10064 (Jun. 2018), http://www.ssa.gov/pubs/EN-05-10064.pdf, last accessed November 4, 2025.

49. Here, the unauthorized access left the cyber criminals with the tools to perform the most thorough identity theft—they have obtained all the essential SPI to mimic the identity of the user. The personal data of Plaintiffs and members of the Class stolen in the Data Breach constitutes a dream for hackers and a nightmare for Plaintiffs and the Class. Stolen personal data of Plaintiffs and members of the Classes represents essentially one-stop shopping for identity thieves.

50. The FTC has released its updated publication on protecting SPI for businesses, which includes instructions on protecting SPI, properly disposing of SPI, understanding network vulnerabilities, implementing policies to correct security problems, using intrusion detection programs, monitoring data traffic, and having in place a response plan.

51. General policy reasons support such an approach. A person whose personal information has been compromised may not see any signs of identity theft for years. According to the United States Government Accountability Office ("GAO") Report to Congressional Requesters:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[11]

52. Companies recognize that SPI is a valuable asset. Indeed, SPI is a valuable commodity. A "cyber black-market" exists in which criminals openly post stolen Social Security numbers and other SPI on a number of Internet websites. The stolen personal data of Plaintiffs and members of the Class has a high value on both legitimate and black markets.

53. Identity thieves may commit various types of crimes such as immigration fraud, obtaining a driver license or identification card in the victim's name but with another's picture, and/or using the victim's information to obtain a fraudulent tax refund or fraudulent unemployment benefits. The United States government and privacy experts acknowledge that it may take years

---

[11] *See* https://www.gao.gov/assets/gao-07-737.pdf (June 2007) at 29, last accessed November 4, 2025.

for identity theft to come to light and be detected.

54. As noted above, the disclosure of Social Security numbers in particular poses a significant risk. Criminals can, for example, use Social Security numbers to create false bank accounts or file fraudulent tax returns. Defendant's former and current customers whose Social Security numbers have been compromised now face a real, present, imminent and substantial risk of identity theft and other problems associated with the disclosure of their Social Security number and will need to monitor their credit and tax filings for an indefinite duration.

55. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change — Social Security number, driver license number or government-issued identification number, name, and date of birth.

56. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[12]

57. Among other forms of fraud, identity thieves may obtain driver licenses, government benefits, medical services, and housing or even give false information to police. An individual may not know that his or her driver license was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud, or until the individual attempts to lawfully apply for unemployment and is denied benefits (due to the prior, fraudulent application and award of benefits).

---

[12] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html, last accessed November 4, 2025.

## FACTS SPECIFIC TO PLAINTIFFS

58. On or about November 1, 2025, Plaintiffs were informed, via letters from Defendant that they were victims of the Data Breach.

59. Since the time of the Data Breach, Plaintiff Moody has experienced an increase in spam calls, texts, and emails related to various financial scams.

60. In addition, on two occasions since the Data Breach, Plaintiff Moody has experienced unauthorized charges on the credit card that she has used for making transactions with Blue Cross Blue Shield of Illinois.

61. While Plaintiff Moody has since had the transactions reversed by the bank in question, this action has taken time and effort and has caused Plaintiff Moody significant emotional distress, anxiety, and increased concerns for the loss of his SPI.

62. On information and belief, unknown hackers were able to access Plaintiff Moody's credit card using, at least in part, information they obtained from the Data Breach.

63. Plaintiffs are aware of no other source from which the theft of their SPI could have come. They regularly take steps to safeguard their own SPI within their own control.

## CLASS ACTION ALLEGATIONS

64. Plaintiffs bring this nationwide class action pursuant to Rules 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following class:

> All natural persons residing in the United States whose SPI was compromised in the Data Breach announced by Defendant on or about October 24, 2025 (the "Class")

65. Additionally, Plaintiffs bring this class action on behalf of the following subclass:

> All natural persons residing in Illinois whose SPI was compromised in the Data Breach announced by Defendant on or about October 24, 2025 (the "Illinois Subcass")

66. Excluded from the Class are all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out, and all judges assigned to hear any aspect of this litigation and their immediate family members.

67. Plaintiffs reserve the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

68. **Numerosity**: The Classes are so numerous that joinder of all members is impracticable. Conduent has, as of this writing, indicated that the total number of Class Members includes at least 42,062 Bay Staters and 374 Mainers. The total number of affected persons and the number of affected Illinoisans is not yet known. The Class is readily identifiable within Defendant's records.

69. **Commonality**: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual members of the Class. These include:

a. When Defendant actually learned of the Data Breach and whether its response was adequate;

b. Whether Defendant owed a duty to the Class to exercise due care in collecting, storing, safeguarding and/or obtaining their SPI;

c. Whether Defendant breached that duty;

d. Whether Defendant implemented and maintained reasonable security procedures and practices appropriate to the nature of storing the SPI of Plaintiffs and members of the Class;

e. Whether Defendant acted negligently in connection with the monitoring and/or protection of SPI belonging to Plaintiffs and members of the Class;

f. Whether Defendant knew or should have known that they did not employ reasonable measures to keep the SPI of Plaintiffs and members of the Classes secure and to prevent loss or misuse of that SPI;

g. Whether Defendant has adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

h. Whether Defendant caused Plaintiffs' and members of the Class damage;

i. Whether Defendant violated the law by failing to promptly notify Plaintiffs and members of the Class that their SPI had been compromised; and

j. Whether Plaintiffs and the other members of the Class are entitled to credit monitoring and other monetary relief.

70. **Typicality**: Plaintiffs' claims are typical of those of the other members of the Class because all had their SPI compromised as a result of the Data Breach due to Defendant's misfeasance.

71. **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs' counsel are competent and experienced in litigating privacy-related class actions.

72. **Superiority and Manageability**: Under rule 23(b)(3) of the Federal Rules of Civil Procedure, a class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Individual damages for any individual member of the Class are likely to be insufficient to justify the cost of individual litigation, so that in the absence of class treatment, Defendant's misconduct would go unpunished. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

73. Class certification is also appropriate under Rule 23(a) and (b)(2) because Defendant have acted or refused to act on grounds generally applicable to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Nationwide Class as a whole and as the Connecticut Subclass as a whole.

74. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would

advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to Plaintiffs and members of the Class to exercise due care in collecting, storing, using, and safeguarding their SPI;

b. Whether Defendant breached a legal duty to Plaintiffs and the members of the Class to exercise due care in collecting, storing, using, and safeguarding their SPI;

c. Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

e. Whether members of the Class are entitled to actual damages, credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendant's wrongful conduct.

## FIRST CLAIM FOR RELIEF
**Negligence**
**(By Plaintiffs Individually and on Behalf of the Nationwide Class)**

75. Plaintiffs hereby re-allege and incorporate by reference all of the allegations in paragraphs 1 to 74.

76. Defendant routinely handles SPI that is required of their customers, such as Plaintiffs and the Class.

77. By collecting and storing the SPI of the Class, Defendant owed a duty of care to the individuals whose SPI it collected to use reasonable means to secure and safeguard that SPI.

78. As a company that regularly does business with healthcare entities, Defendant is aware of that duty of care to the SPI of its customers.

79. Defendant has full knowledge of the sensitivity of the SPI and the types of harm that Plaintiffs and Class Members could and would suffer if the SPI were wrongfully disclosed.

80. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of customers' SPI involved an unreasonable risk of harm to Plaintiffs and Class Members, even if the harm occurred through the criminal acts of a third party.

81. Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that Plaintiffs' and Class Members' information in Defendant's possession was adequately secured and protected.

82. Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of Plaintiffs' and Class Members' SPI.

83. A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class Members was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

84. Plaintiffs and the Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew of should have known of the inherent risks in collecting and storing the SPI of Plaintiffs and the Class, the critical importance of providing adequate security of that SPI, and the necessity for encrypting SPI stored on Defendant's systems.

85. Defendant's own conduct created a foreseeable risk of harm to Plaintiffs and Class Members. Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included its decisions not to comply with industry standards for the safekeeping of Plaintiffs' and

Class Members' SPI, including basic encryption techniques freely available to Defendant.

86. Plaintiffs and the Class Members had no ability to protect their SPI that was in, and possibly remains in, Defendant's possession.

87. Defendant was in a position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

88. Defendant had and continue to have a duty to adequately disclose that the SPI of Plaintiffs and Class Members within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their SPI by third parties.

89. Defendant had a duty to employ proper procedures to prevent the unauthorized dissemination of the SPI of Plaintiffs and Class Members.

90. Defendant has admitted that the SPI of Plaintiffs and Class Members was purposely exfiltrated and disclosed to unauthorized third persons as a result of the Data Breach.

91. Defendant, through its actions and/or omissions, unlawfully breached their duties to Plaintiffs and Class Members by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the SPI of Plaintiffs and Class Members during the time the SPI was within Defendant's possession or control.

92. Defendant improperly and inadequately safeguarded the SPI of Plaintiffs and Class Members in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

93. Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect its current and former employees' SPI in the face of increased risk of theft.

94. Defendant, through their actions and/or omissions, unlawfully breached their duty to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of its current and former employees' SPI.

95. Defendant, through its actions and/or omissions, unlawfully breached their duty to adequately and timely disclose to Plaintiffs and Class Members the existence and scope of the Data Breach.

96. But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and Class Members, the SPI of Plaintiffs and Class Members would not have been compromised.

97. There is a close causal connection between Defendant's failure to implement security measures to protect the SPI of Plaintiffs and Class Members and the harm suffered or risk of imminent harm suffered by Plaintiffs and the Class. Plaintiffs' and Class Members' SPI was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such SPI by adopting, implementing, and maintaining appropriate security measures.

98. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their SPI is used; (iii) the compromise, publication, and/or theft of their SPI; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their SPI; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their SPI, which remain in Defendant's possession and is subject to further unauthorized disclosures so long

as Defendant fail to undertake appropriate and adequate measures to protect the SPI of its employees and former employees in its possession; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the SPI compromised as a result of the Data Breach for the remainder of Plaintiffs' and Class Members' lives.

99. Additionally, as a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will suffer the continued risks of exposure of their SPI, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the SPI in its continued possession.

**SECOND CLAIM FOR RELIEF**
**Breach of Third-Party Beneficiary Contract**
**(By Plaintiffs Individually and on Behalf of the Nationwide Class)**

100. Plaintiffs and the Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 74.

101. Upon information and belief, Defendant entered into contracts with its corporate customers to provide services to them; services that included data security practices, procedures, and protocols sufficient to safeguard the SPI that was entrusted to them.

102. Such contracts were made expressly for the benefit of Plaintiffs and the Class, as it was their SPI that Defendant agreed to receive, store, utilize, transfer, and protect through its services. Thus, the benefit of collection and protection of the SPI belonging to Plaintiffs and the Class was the direct and primary objective of the contracting parties and Plaintiffs and Class Members were direct and express beneficiaries of such contracts.

103. Defendant knew or should have known that if they were to breach these contracts with its customers, Plaintiffs and Class Members would be harmed.

104. Defendant breached its contracts with corporate customers by, among other things,

failing to adequately secure Plaintiffs' and Class Members' SPI, and, as a result, Plaintiffs and Class Members were harmed by Defendant's failure to secure their SPI.

105. As a direct and proximate result of Defendant's breach, Plaintiffs and Class Members are at a current and ongoing risk of identity theft, and Plaintiffs and Class Members sustained incidental and consequential damages including: (i) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (ii) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (iii) financial "out of pocket" costs incurred due to actual identity theft; (iv) loss of time incurred due to actual identity theft; (v) loss of time due to increased spam and targeted marketing emails; (vi) diminution of value of their SPI; (vii) future costs of identity theft monitoring; (viii) and the continued risk to their SPI, which remains in Defendant's control, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' SPI.

106. Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

107. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## THIRD CLAIM FOR RELIEF
**Unjust Enrichment, in the Alternative**
**(By Plaintiffs Individually and on Behalf of the Nationwide Class)**

108. Plaintiffs hereby re-allege and incorporate by reference all of the allegations in paragraphs 1 to 74.

109. Plaintiffs and Class Members conferred a monetary benefit upon Defendant in the form of storing their SPI with Defendant in such a way that saved expense and labor for Defendant.

110. Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members. Defendant also benefited from the receipt of Plaintiffs' and Class Members' SPI, as this was used by Defendant to facilitate its core functions.

111. The benefits given by Plaintiffs and Class Members to Defendant were to be used by Defendant, in part, to pay for or recoup the administrative costs of reasonable data privacy and security practices and procedures.

112. As a result of Defendant's conduct, Plaintiffs and Class Members suffered actual damages in an amount to be determined at trial.

113. Under principles of equity and good conscience, Defendant should not be permitted to retain a benefit belonging to Plaintiffs and Class Members because Defendant failed to implement (or adequately implement) the data privacy and security practices and procedures that Plaintiffs and Class Members granted to Defendant or were otherwise mandated by federal, state, and local laws and industry standards.

114. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds or benefits it received as a result of the conduct alleged herein.

**FOURTH CLAIM FOR RELIEF**
**(Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq*.)**
**(By Plaintiffs Individually and on Behalf of the Illinois Subclass)**

115. Plaintiffs hereby re-allege and incorporate by reference all of the allegations in paragraphs 1 to 74.

116. Plaintiffs are "consumers" as that term is defined in 815 ILCS 505/1(e).

117. Defendant is engaged in "trade" or "commerce", including the provision of services, as those terms are defined under 815 ILCS 5051(f).

118. Defendant engages in the "sale" of services as defined in 815 ILCS 505/1(b).

119. Defendant engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of "merchandise" (as defined in the ICFA) in violation of the ICFA, including but not limited to the following:

a. Failing to maintain sufficient security to keep Plaintiffs' and Class Members' SPI from being hacked and stolen; and

b. Failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect Plaintiffs' and Class Members' SPI and other personal information from further unauthorized disclosure, release, data breaches, and theft.

120. In addition, Defendant's failure to disclose that its computer systems were not well-protected and that Plaintiffs' and Illinois Subclass Members' SPI was vulnerable and susceptible to intrusion and cyberattacks constitutes deceptive and/or unfair acts or practices because Defendant knew such facts would (a) be unknown to and not easily discoverable by Plaintiffs and Class Members; and (b) defeat Plaintiffs' and Illinois Subclass Members' ordinary, foreseeable and reasonable expectations concerning the security of their SPI on Defendant's servers.

121. Defendant intended that Plaintiffs and Illinois Subclass Members rely on its deceptive and unfair acts and practices, misrepresentations, and the concealment, suppression, and omission of material facts, in connection with its offering of services and incorporating Plaintiffs' and Class Members' SPI on its servers, in violation of the ICFA.

122. Defendant also engaged in unfair acts and practices by failing to maintain the privacy and security of Plaintiffs' and Illinois Subclass Members' SPI, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Data

Breach. These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45) and similar state laws.

123. Defendant's wrongful acts and practices occurred within the ordinary course of trade or commerce.

124. Defendant's wrongful acts and practices were and are injurious to the public interest because those practices were part of a generalized course of conduct on the part of Defendant that applied to Plaintiffs and Illinois Subclass Members and were repeated continuously before and after Defendant obtained SPI and other information from Plaintiffs and Illinois Subclass Members. Plaintiffs and Illinois Subclass Members were adversely affected by Defendant's conduct and the public was and is at risk as a result thereof.

125. Defendant also violated 815 ILCS 505/2 by failing to immediately notify Plaintiffs and Illinois Subclass Members of the nature and extent of the Data Breach pursuant to the Illinois Personal Information Protection Act ("IPIPA"), 815 ILCS 530/45, *et. seq*., which provides:

> A data collector that owns or licenses, or maintains or stores but does not own or license, records that contain personal information concerning an Illinois resident shall implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure.

126. 815 ILCS 530/20 provides that a violation of 815 ILCS 530/10 "constitutes an unlawful practice under the Consumer Fraud and Deceptive Business Practices Act."

127. As a result of Defendant's wrongful conduct, Plaintiffs and Illinois Subclass Members were injured in that they never would have allowed their SPI – the value over which Plaintiffs and Illinois Subclass Members no longer have control – to be provided to Defendant if they had been told or knew that Defendant failed to maintain sufficient security to keep such data from being hacked and taken by others.

128. Defendant's unfair and/or deceptive conduct proximately caused Plaintiffs' and Illinois Subclass Members' injuries because, had Defendant maintained customer SPI with adequate security, Plaintiffs and Illinois Subclass Members would not have lost it.

129. As a direct and proximate result of Defendant's conduct, Plaintiffs and Illinois Subclass Members have suffered harm, including but not limited to loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; financial losses related to the purchases made from Defendant that Plaintiffs and Illinois Subclass Members would have never made had they known of Defendant's careless approach to cybersecurity; lost control over the value of SPI; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen SPI, entitling them to damages in an amount to be proven at trial.

130. Pursuant to 815 ILCS 505/10a(a), Plaintiffs and Illinois Subclass Members seek actual and compensatory damages, injunctive relief, and court costs and reasonable attorneys' fees as a result of Defendant's violations of the ICFA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class Members, request judgment against the Defendant and the following:

A. For an Order certifying the Class as defined herein, and appointing Plaintiffs and their counsel to represent the Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and the Class Members' SPI;

C. For injunctive relief requested by Plaintiffs, including but not limited to, injunctive

and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the personal identifying information of Plaintiffs and Class Members' personal identifying information;

iv. prohibiting Defendant from maintaining Plaintiffs' and Class Members' personal identifying information on a cloud-based database (if, in fact, it does so);

v. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vi. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

vii. requiring Defendant to audit, test, and train its security personnel regarding

any new or modified procedures;

viii. requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

ix. requiring Defendant to conduct regular database scanning and securing checks;

x. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xi. requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii. requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii. requiring Defendant to implement, maintain, regularly review, and revise as

necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xv. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvi. for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment; and

D. For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For pre- and postjudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED: November 5, 2025

Respectfully Submitted,

/s/ Mark C. Rifkin
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
270 Madison Ave.
New York, NY
Tel: (212) 545-4600
Fax: (212) 686-0114
rifkin@whafh.com

Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, Illinois 60604
Tel: (312) 984-0000
Fax: (212) 686-0114
malmstrom@whafh.com

*Counsel for Plaintiffs and the Proposed Class*